# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Geraldine Soat Brown | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 3234 | **DATE** | 12/11/2001 |
| **CASE TITLE** | | Chesler vs. Trinity | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons set out in the Memorandum Opinion and Order, the Court DENIES Trinity's motion for judgment as a matter of law [201-1], GRANTS Trinity's motion for a new trial [201-2], and VACATES the judgment entered on May 8, 2001. [196-1] Further, the Court hereby reconsiders its decision to deny the motion of Western Industries, Inc. and Bernard Hanna to vacate the order of default previously entered against them [160-1], and GRANTS that motion. Status hearing set for 1/02/02 at 9:30 a.m. *Geraldine Soat Brown*

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | **Document Number** |
| | No notices required. | number of notices | |
| ✓ | Notices mailed by judge's staff. | DEC 1 2 2001 | |
| | Notified counsel by telephone. | date docketed | |
| | Docketing to mail notices. | docketing deputy initials | 227 |
| | Mail AO 450 form. | 12/11/2001 | |
| | Copy to judge/magistrate judge. | date mailed notice | |
| tw | courtroom deputy's initials | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

01 DEC 11 PM 4: 12



FILED

DEC 1 2 2001

| | |
|---|---|
| ROBERT CHESLER | ) |
| | ) |
| Plaintiff, | ) Cause No. 99 C 3234 |
| | ) |
| v. | ) Magistrate Judge Geraldine Soat Brown |
| | ) |
| TRINITY INDUSTRIES, INC., and | ) |
| TRINITY INDUSTRIES | ) |
| TRANSPORTATION, INC., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

On May 4, 2001, the jury returned a verdict in favor of plaintiff Robert Chesler ("Chesler")
and against defendant Trinity Industries Transportation, Inc. ("Trinity") in the amount of
$11,230,000, to be reduced by 20% representing the apportionment of Chesler's comparative fault,
for a net verdict of $8,984,000. The jury also returned a verdict on Trinity's third-party complaints
in favor of third-party defendants Western Industries, Inc., Western Transportation, Inc., Bernard
Hanna and Tim Reid ("Reid"). On May 22, 2001, Trinity moved pursuant to Fed. R. Civ. P. 50 for
judgment as a matter of law and, alternatively, for a new trial pursuant to Fed. R. Civ. P. 59(a).
(Def.-Third-Party Pl.'s Post-Trial Mot. Pursuant to Fed. R. Civ. P. 50 and 59 ("Def.'s Post-Trial
Mot.") [Dkt # 201].) For the reasons set out herein, and after careful consideration of the issues and
the evidence at trial, the Court DENIES Trinity's motion for judgment as a matter of law, GRANTS
Trinity's motion for a new trial, and VACATES the judgment entered on May 8, 2001. [Dkt # 196.]
Further, the Court hereby reconsiders its decision to deny the motion of Western Industries, Inc. and

1

*227*

Bernard Hanna to vacate the order of default previously entered against them [Dkt #160], and GRANTS that motion.

## FACTUAL BACKGROUND

This case arose from an incident that occurred on Interstate Highway 80 outside of North Platte, Nebraska on March 13, 1999. Chesler, then a 19-year-old college student, had been driving west from Chicago to Colorado with Reid in a car owned by Reid's father. About 10 miles outside of North Platte, cars and trucks were stopped on the Interstate as a result of a previous collision. Under circumstances disputed at trial, Chesler stopped the Reid car and Reid and Chesler both got out of the vehicle. A truck owned by Trinity and driven by Trinity employee Norman Jack Beaty was also proceeding westbound on I-80. There was a collision, the sequence of which was also disputed at trial, and Chesler sustained injuries to his back and right arm. Although the injuries did not result in the amputation of Chesler's arm or any portion of his hand, Chesler presented evidence at trial that as a result of the injury he lost significant function of his arm and hand, and suffers from complex regional pain syndrome or reflex sympathetic dystrophy ("RSD")in his arm.

Chesler filed this lawsuit against Trinity in May 1999. Judge Ann Williams, who initially presided over the case, ruled that Nebraska law governed issues of liability and Illinois law governed issues of damages. Mem. Op. and Order at 9 (July 2,1999) [Dkt # 12].[1] In 2000, Trinity filed third-party complaints against Reid and against Western Industries, Inc., Western Transportation, Inc., and Bernard Hanna. [Dkt #28, 47.] The third-party complaints alleged that those third-party defendants were negligent, and that if Trinity is held liable to Chesler, Trinity's acts "necessarily have combined

---

[1] The parties subsequently consented to the exercise of jurisdiction by the Magistrate Judge. [Dkt ## 27, 220, 223.]

with the acts" of the third-party defendants so as to produce Chesler's damages. Second Am. Third-Party Compl., ¶12 [Dkt # 47.] Reid answered and later moved for summary judgment, which was denied. [Dkt # 163.] When Western Industries, Inc. and Western Transportation, Inc. and Bernard Hanna failed to appear or answer in response to the service of summons, Trinity moved for default. On September 12, 2000 and November 22, 2000, Trinity's motions for default were granted against Western Industries, Inc. and Bernard Hanna [Dkt # 46] and Western Transportation, Inc. [Dkt # 53.] Pursuant to Fed. R. Civ. P. 55(b)(2), the Court reserved the issue of damages against those defaulted third-parties. [*Id.*]

By order dated December 21, 2000, a jury trial was scheduled to begin on April 16, 2001. On April 3, 2001, less than two weeks before the scheduled trial date, attorneys for Western Industries, Inc. and Bernard Hanna appeared in the case for the first time and moved, first, to vacate the summons served upon those parties, and secondly, to vacate the order of default entered against them. [Dkt ## 152, 153.] After briefing and argument, the Court denied both motions. [Dkt # 160.] Western Transportation, Inc. has never appeared and remains defaulted. After consideration of and ruling on those motions and numerous motions in limine filed by the parties, voir dire of potential jurors began on April 23, 2001. Jury selection was completed and the jury was sworn on April 24, 2001. Evidence was presented from April 24 to May 2, 2001. The jury was instructed on May 2, 2001 and returned its verdict on May 4, 2001.

The jury's verdict awarded a total of $11,230,000 in damages, and apportioned negligence as follows: Trinity, 80%; Chesler, 20%; Reid, 0%; Western Industries, Inc., 0%; Western Transportation, Inc., 0%; and Bernard Hanna, 0%.

## I. TRINITY'S MOTION FOR JUDGMENT AS A MATTER OF LAW

Trinity argues that the verdict should be vacated and judgment entered as a matter of law in favor of Trinity pursuant to Fed. R. Civ. P. 50(b) on the ground that there was insufficient evidence to support the verdict for Chesler, and the evidence so overwhelmingly favors Trinity that no verdict for Chesler can stand. (Def.'s Post-Trial Mot. at 2-4.) Chesler correctly points out that a post-verdict motion under Rule 50(b) for judgment as a matter of law cannot be made unless a previous motion for judgment as a matter of law was made by the moving party at the close of all of the evidence. 9A Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure: Civil 2d* (hereinafter "Wright & Miller") § 2537 at 335-36 (1995). Trinity did not make a motion pursuant to Rule 50(a) at the close of Chesler's evidence or at the close of all the evidence. Furthermore, even if it could be considered, Trinity's motion fails to specify facts and law demonstrating that "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a). On a motion for judgment as a matter of law, the court reviews whether "the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in the light most favorable to the party against whom the motion is directed." *Mathur v. Bd. of Trustees of S. Illinois Univ.*, 207 F.3d 938, 941 (7th Cir. 2000). Applying this standard, Trinity's motion must be denied.

## II. TRINITY'S MOTION FOR A NEW TRIAL

A motion for a new trial does not require the movant to have made a motion for judgment as a matter of law. 9A Wright & Miller, § 2531 at 125 (Supp. 2001). The standard for granting a new trial is less stringent than the standard for judgment as a matter of law. Unlike judgment as a

matter of law, a new trial may be granted even if there is substantial evidence to support the jury's

verdict. *Mono v. Peter Pan Bus Lines, Inc.*, 13 F. Supp. 2d 471, 475. (S.D. N.Y. 1998).

> The test to be applied in determining whether a motion for a new trial should be
> granted is whether "the verdict is against the weight of the evidence, that the
> damages are excessive, or that, for other reasons, the trial was not fair to the party
> moving."

*Walden v. Illinois Central Gulf R. R.*, 975 F.2d 361, 365 (7th Cir. 1992), quoting prior authority.

Trinity argues nineteen reasons why it deserves a new trial. (Def.'s Post-Trial Mot. at 4-8.)

Because the Court agrees with at least three of those reasons, and grants Trinity a new trial, it is not

necessary to decide whether the other reasons would also justify a new trial, and the Court makes

no decision on those issues.


A. The damages awarded by the jury were excessive.

The jury's verdict of $11,230,000 (before the 20% reduction) consisted of the following:

> Disfigurement – $1,000,000
>
> Disability, past and future – $3,600,000
>
> Pain and suffering, past and future – $5,750,000
>
> Medical expenses, past and future – $600,000
>
> Lost earnings, past and future – $280,000.

The total amount for disfigurement, disability and pain and suffering ($10,350,000, the "non-

economic loss") is more than ten times the total amount for lost earnings and medical expenses

($880,000, the "economic loss").

Citing *U. S. EEOC v. AIC Security Investigations, Ltd.*, 55 F. 3d 1276, 1285 (7th Cir. 1995),

Trinity argues that the award of damages is "monstrous," that there is no rational connection between

the award and the evidence, and that the award is not comparable to awards made in similar cases. (Def.'s Mem. Law in Supp. Post-Trial Mots. at 11-12.) Trinity requests a new trial or, alternatively, a remittitur of the verdict to $2,880,000. (*Id.* at 12.) Both Trinity and Chesler refer to awards in other cases that they assert are comparable to this case. (*Id.*; Pl.'s Resp. to Def.'s Post Trial Mot. ("Pl.'s Resp.") at 10 [Dkt # 211].)

In *Jutzi-Johnson v. U.S.*, 263 F.3d 753 (7th Cir. 2001), the Seventh Circuit recently discussed the review of jury awards of damages for pain and suffering. The Court stated as "the rule in Illinois, that comparable awards for pain and suffering are not to be considered at either the appellate or the trial stage." *Id.* at 760, citing cases. The Seventh Circuit concluded that it would not follow the Illinois rule in *Jutzi-Johnson* for a number of reasons, including the fact that the claim in that case arose under federal law, and therefore, there was no concern that the *Erie* doctrine would require the Illinois rule to be applied as a matter of substantive law. *Id.* The Seventh Circuit did not decide whether the practice of consulting or not consulting comparable awards is substantive. *Id.*

Unlike *Jutzi-Johnson,* the present case is in federal court because of diversity jurisdiction and damages are governed by Illinois law. Thus, this analysis begins with the Illinois courts' approach to reviewing jury verdicts. In *Epping v. Commonwealth Edison Co.*, 734 N. E. 2d 916 (Ill. App. 2000), the Illinois Appellate Court upheld an award of $9 million in non-economic damages, along with $4.5 million for past and future economic damages. The defendant requested a new trial or a remittitur of $5 million non-economic damages, arguing that the award was disproportionately high when viewed in light of awards given in other cases. *Id.* at 918. The court rejected that argument, stating that the Illinois courts have traditionally declined to use comparisons when determining whether an award is excessive. *Id.* The correct analysis, the court said, is the following:

6

The power to order a remittitur of damages--a long recognized and accepted part of Illinois law--should be employed only when an award falls outside the range of fair and reasonable compensation, appears to be the result of passion or prejudice, or is so large that it shocks the judicial conscience.

. . . . .

There is no mathematical formula for deciding whether an award is fair and reasonable. Factors which may be considered are: the extent of the injuries suffered and permanency of the plaintiff's condition, the plaintiff's age, the possibility of future deterioration, the extent of the plaintiff's medical expenses, and the restrictions imposed on the plaintiff by the injuries.

. . . . .

This case is not about an injury to an arm or a leg. It is about the nature and extent of injuries to a particular woman. It is about the life she is required to lead because of the defendant's negligence.

*Id.* (citations omitted).

Except for the question of comparing verdicts in other cases, the Illinois standard recited in *Epping* is similar to the federal standard in *U. S. EEOC v. AIC Security Investigations, Ltd*, cited by Trinity. Important to both standards is whether there is a rational relationship between the award and the evidence.

After reviewing the evidence in this case and assuming that the jury accepted as true all of the disputed facts about Chesler's condition, the Court is left with a clear conviction that the award here cannot stand.[2]

There is no doubt that Chesler suffered substantial injuries as a result of the accident. He had several broken vertebra. Following the accident, he went through major surgery to correct scoliosis (curvature of the spine). Although Trinity argued that the scoliosis was present prior to the accident, the jury could have concluded from the evidence presented that the scoliosis was aggravated to the point of requiring surgery by the injuries incurred in the accident. Most significantly, Chesler

---

[2] Transcripts of all of the jury proceedings were provided to the Court on a disk and were reviewed by the Court in making this ruling.

suffered injury to his right (dominant) arm. The extent of that injury was the subject of much of the testimony and argument relating to damages. Unlike the plaintiff in *Epping*, Chesler did not lose any portion of his right arm or hand. Chesler's evidence was directed to proving that he has lost function in his right arm and suffers continuous pain as a result of RSD. The physician who has treated Chesler for pain, Dr. Kurzydlowski, testified that Chesler has gross motor function in his right arm, but not fine motor function. He testified that Chesler has a base level of pain, estimated as 3 on a scale of 0 to 10, which may flare up to a level of 7 if Chesler's arm is touched or bumps into something like a chair. He has treated Chesler with pain medication, injections, and physical therapy. Dr. Kurzydlowski also testified that it was possible that Chesler might be assisted by surgical insertion of a spinal cord stimulator. Dr. Kurzydlowski estimated the cost of performing the surgery and the maintenance of the stimulator. The jury's award of $600,000 for past and future medical costs clearly included the cost of implanting and maintaining such a stimulator.

Trinity's expert witness, Dr. Barolat, did not dispute Dr. Kurzydlowski's estimate of Chesler's base pain as 3 on a scale of 0 to 10, but he described that level of pain as more in the range of mild to moderate. The estimate of pain on a numerical scale is based on the patient's subjective complaints, which Dr. Barolat accepted as true for his testimony. He testified that he has implanted spinal cord stimulators in hundreds of patients with Chesler's medical profile. The spinal cord stimulator would not eliminate all pain but it reduces the baseline pain level and the number and intensity of flare-ups, and reduces the need for pain medications. Dr. Barolat testified that the base pain level of 3 is borderline for the insertion of a stimulator, but he would implant the stimulator to reduce the flare ups. He also testified that Chesler may need pain medications from time to time. In his opinion, with or without the stimulator, Chesler could return to school and go on to a sedentary

8

career, not manual labor, although he might have some difficulty concentrating.

Chesler's physical and occupational therapists testified that he experienced pain in performing the exercises but was cooperative. His hand was sometimes swollen and his arm was sometimes "blotchy" or "mottled." They are working to change his dominance from his right hand to his left hand. Occupational therapist Robin Boucher who saw Chesler a few weeks before the trial testified that she noted improvements in skill with his left hand, for example in his writing and other activities of daily living. Chesler's mother testified that Chesler can now write legibly with his left hand and he can eat and dress on his own, although he socializes much less than before the injury and becomes frustrated working with the computer. Chesler's friends testified that he is more limited in his social activities, for example, when he goes out he stays only a couple of hours, and he cannot drive. Chesler is protective of his right arm and concerned about bumping it.

Chesler testified that prior to the injury he had an active social and school life, and now his social life is much more limited. He goes out about once or twice a week to movies or lunch or rents a movie. He cannot go to crowded places. He testified that his right arm always hurts, and touch or vibration makes it worse. His arm hurts from the shoulder to fingers, and cold air and rough material also hurts. His right hand and fingers can not move, although he can rotate and lift his arm. He has decided to have the spinal cord stimulator implanted, and wants to return to school and to work. On cross-examination he testified that he completed one college course, psychology in business, after the accident. He is able to read magazines and his hobby is following the stock market.

Dr. Yarkony, called by Chesler as an expert witness, testified that he had performed a functional capacity evaluation on Chesler in February 2000 and concluded that Chesler could not

be employed because of his pain and the medications that he takes. Based on that testimony, an economist called by Chesler testified that, if Chesler is unable to work, his loss of earnings (salary and benefits) over his expected lifetime, reduced to present value, would be approximately $1,328,000. Obviously, the jury rejected that conclusion because the jury awarded Chesler only $280,000 for lost earnings, past and future.

The above summary is not intended as a complete recapitulation of the evidence, but to illustrate the evidence that the jury had before it. The evidence demonstrated that Chesler was injured and impaired to some level, presumably permanently. The evidence also showed that he endured substantial pain leading up to and as a result of the back surgery for scoliosis in March 2000. He has a limitation of movement in his arm that permits him gross motor function but not fine motor function in his formerly dominant hand. He has a base pain level and pain flare-ups in his arm that also inhibit his activities. Yet, the evidence also showed that his scoliosis condition is resolved and, although he will not be able to perform manual labor, he is not experiencing pain in his back. Because of the condition of his arm, he must compensate by way of various tools and by attempting to switch functions to his left hand. Apparently he is experiencing some success in doing so. His arm may be a source of pain for the rest of his life, but there is a treatment (the spinal cord stimulator) that he intends to undergo, which, if successful, will significantly reduce his pain level. Even without that treatment he is able to socialize regularly, perform the functions of daily living, write, read magazines, and follow the stock market. All of the evidence suggests that the quality of Chesler's life, while in all likelihood permanently impaired by the injury, has improved and will continue to improve from the condition immediately following the injury, especially now that his back surgery is successfully completed.

After reviewing all of the evidence, including the evidence summarized above, this Court is left with the firm conviction that the award of over $10 million for non-economic damages, including $1 million for disfigurement, $3.6 million for past and future disability and $5.75 million for pain and suffering, bears no rational relationship to the evidence. This conclusion is reinforced by the gross disproportion of non-economic damages to economic damages. As noted above, the jury obviously rejected the argument that Chesler's pain prevents him from engaging in productive work. Therefore, the jury did not conclude that Chesler's life would be as restricted as the award of $10 million in non-economic damages suggests.

Because the Seventh Circuit's opinion in *Jutzi-Johnson* leaves open the issue of whether federal courts sitting in diversity jurisdiction may consider jury verdicts in comparable cases, the awards in the cases suggested by the parties were considered. Chesler points to jury verdicts for back injuries ranging from $1.047 million to $2.1 million, and two cases where parents of newborns were awarded $13.29 million and $7.53 million on behalf of their respective children who had suffered "brachial plexus" injury because of medical malpractice in childbirth. (Pl.'s Resp. to Post Trial Mot., Exs. 2-3.) The latter cases cannot properly be compared because there is no basis on which to compare brachial plexus injury to the injury incurred by Chesler. There is no information on which to evaluate the degree of pain or use of the arm by the plaintiffs in those cases, or what the evidence showed about the degree of deformity the child would endure for his or her entire life. Furthermore, the $7.53 million verdict included over $2 million in economic damages, while in the case of the $13.29 million verdict there is no information about how much of that amount was economic damages. Similar problems exist in equating Chesler's injury to the back injury cases. The jury that awarded the $2.1 million verdict apparently believed that the plaintiff would suffer

almost as much future pain ($650,000) as past pain ($750,000). In this case, Chesler's back pain is essentially resolved. In the case of the $1.3 million verdict, the surgeries to repair the injury left the plaintiff with virtually no range of movement of his head or neck, which is not the case here. In the case of the $1.047 million verdict, nothing is known except that the plaintiff underwent surgery similar to Chesler's.

Trinity points to jury verdicts for RSD ranging from $10,000 to $2.834 million. (Def.'s Post-Trial Mot., Exs. 3-4.) The case in which the $2.834 million verdict was rendered seems closest factually to Chesler's situation. According to the Jury Verdict Reporter summary (Def.'s Post-Trial Mot., Ex. 4), the plaintiff, an apprentice roofer, was injured at work, and developed RSD in his left foot and lower leg, resulting in severe pain. He underwent the implantation of a spinal cord stimulator which gave him 80% relief, but was unable to return to work as a roofer, and suffered depression and anxiety. The jury awarded approximately $1.3 million in economic damages and $1.5 million in non-economic damages.

Trinity suggests a remittitur in the amount of $2,880,000 as a net judgment. Ordinarily, when the court grants a new trial because damages are excessive, the Court will allow the prevailing plaintiff the option of a remittitur or a new trial on damages. *Haluschak v. Dodge City of Wauwatosa, Inc.*, 909 F.2d 254, 256-57 (7th Cir. 1990). In this case, it is uncertain whether a new trial could be ordered only on the issue of damages.

> Partial trials are proper if "it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice." *Gasoline Prods. Co. v. Champlin Refining*, 283 U.S. 494, 500, 51 S.Ct 513, 515, 75 L.Ed 1188(1931). If, however, the "question of damages. . . is so interwoven with that of liability that the former cannot be submitted to the jury independently of the latter without confusion and uncertainty," *id.*, then a trial on only one issue is tantamount to a denial of a fair trial.

*McClain v. Owens-Corning Fiberglas Corp.*, 139 F.3d 1124, 1128 (7th Cir.1998). However, the issue is moot, because, for the reasons set out below, a new trial must be held on the liability issues as well. Thus, the option of remittitur is not appropriate.

B. The circumstances regarding third-party defendants Western and Hanna require that the default order against them be vacated, additional discovery be taken, and a new trial be held at which their proportionate share of fault and damages (if any) can be properly determined by the jury.

As discussed above, in the fall of 2000, orders of default were entered against three of the third-party defendants: Western Transportation, Inc., Western, Industries, Inc. ("Western") and its employee, Bernard Hanna ("Hanna"). On April 3, 2001, less than two weeks before trial was scheduled to begin, counsel for Western and Hanna made an emergency motion to vacate the service of summons and to vacate the order of default. In the motion and at the argument on April 10, 2001, counsel for Western and Hanna explained that his law firm had just been notified of the lawsuit by Western's insurer, which in turn had become aware of the lawsuit as a result of a medical claim made by a third party. (Emergency Mot. to Vacate Default Judm. at 8 [Dkt #152].) The motion to vacate summons was denied because Western and Hanna failed to present any evidence that they had not been properly served or that they were, in fact, unaware of the summons. Argument was then heard on the motion to vacate the default. Western and Hanna argued that they would need additional time to prepare a defense. Trinity's counsel agreed that if the motion to vacate the default were granted, it would be necessary to continue the trial date for appropriate discovery, but, since counsel for Western and Hanna had acknowledged that he had not had an opportunity to contact either of his clients, the nature of the defense they would present was just speculation. (Tr. April 10, 2001 at 26.)

At that time, continuing the imminent trial date for an undetermined period because of the last-minute appearance of defaulted third-party defendants who had not presented any reason why they had not appeared previously seemed unfair to all the other parties. However, leaving the default order in place presented the issue of how a third-party defendant as to whom a default order has been entered on the issue of liability but no damages have been assessed should be treated in a personal injury action in which the issue of damages (but not liability) is governed the Illinois Joint Tortfeasor Contribution Act, 740 Ill. Comp. Stat. 100/2 (2000). Trinity's counsel pointed out that, generally, the jury assesses the proportionate share of all tortfeasors, whether they are parties or not:

> Trinity's counsel: The plaintiff proves his case. Then we go to the jury. There's a verdict form and the plaintiff's total damages are assessed. Then the jury, under Illinois law, on the issue of damages apportions negligence as to each particular tortfeasor, whether they are a party or not a party, okay? What our third party -- Let's say, for example, that this goes to trial. There's a verdict against Trinity on the main case and there's an assessment by the jury apportioning fault to each one of the joint tortfeasors who are in the case, let's say there's four of them, 20 percent each, and then 20 percent of the plaintiff. That makes for a total of 100 percent.

(Tr. April 10, 2001 at 47.)

Trinity's counsel argued against Western and Hanna's being permitted to participate in the trial in any respect, even to diminish the assessment of damages against them. To permit Western and Hanna to argue that they are only responsible for a certain percentage of damages, Trinity argued, would be to permit them to put on a liability defense, contrary to the default order. (Tr. April 10, 2001 at 45-46.) Trinity argued that if Western and Hanna were permitted to participate in the trial to diminish the assessment of damages against them, Trinity should be permitted to take discovery and to have Hanna present to testify. (*Id.* at 53.)

Trinity took the position that whatever verdict was assessed by the jury against Trinity would

be the responsibility of Western and Hanna as a result of the default. However, Trinity's Third-Party Complaint against Western and Hanna alleged facts supporting contribution, not indemnification. There was no factual basis asserted to make Western and Hanna indemnitors of Trinity's liability to Chesler. Trinity's counsel further argued that to bifurcate the trial, *i.e.*, to have a hearing by the court on the damages to be assessed against Western and Hanna after the jury trial on all other issues, would also impose an unfair burden on Trinity. At the conclusion of the April 10, 2001 hearing, the Court requested further briefing on the topic, but ordered Western and Hanna to produce to Trinity's counsel "as soon as possible" the insurance policy referred to in their motions to vacate the summons and default. (*Id.* at 58.)

After reviewing the briefs submitted by the parties and the authorities cited, including *Fehlhaber v. Indian Trails, Inc.*, 425 F.2d 715 (3d Cir. 1970), this Court ruled that following the trial on liability a hearing would be held at which the court would determine the damages to be assessed against Western and Hanna. It was also determined that Western and Hanna's attorney could not participate in the trial, although the attorney could attend, as could any member of the public. All parties except Western and Hanna agreed that a "line item" for Western and Hanna should appear on the verdict form and the jury should be asked to apportion their fault. (Tr. April 20, 2001 at 26-30; Trinity Industries Trans., Inc.'s Resp. to Third Party Defs.' Brief Regarding Attendance at Trial at 3, n.2.) Trinity also argued that, if the Court did not agree with Trinity's position that Western and Hanna were entirely responsible for all damages assessed against Trinity, the jury's apportionment of fault should be binding on the Court at the subsequent hearing determining damages. (Trinity Industries Trans., Inc.'s Resp. to Third Party Defs.' Brief Regarding Attendance at Trial at 11.)

The jury was instructed:

Trinity's claims that Bernard Hanna, Western Industries, Inc. and Western Transportation, Inc. were negligent have been resolved in favor of Trinity because Bernard Hanna, Western Industries, Inc. and Western Transportation, Inc. failed to deny or defend Trinity's claims.

(Tr. May 2, 2001 at 186.) The verdict form asked the jury, "What percentage of negligence was Bernard Hanna, Western Industries, and Western Transportation's?" The jury assigned "0 [zero]." At the hearing on May 8, 2001, to assess damages on Trinity's third-party complaint against Hanna, Western and Western Transportation, Inc., the Court followed the jury assessment and assessed no damages against those third-party defendants.

During the trial, Trinity had brought a Motion to Compel Western to produce the documents referenced in Western's Emergency Motion to Vacate. [Dkt # 174.] Trinity stated that, notwithstanding the order on April 10, 2001, Western had produced only the declarations page and coverage form, and not a complete copy of the insurance policy referred to in its Motion to Vacate, and that Western had not produced information making any connection between the claim of Richard Hesse (presumably the medical payment claim referred to in Hanna and Western's Emergency Motion to Vacate Default Judgment) and this case. Even after the trial concluded, counsel for Western and Hanna was not able to state how the connection had been made. (Tr. May 8, 2001 at 19-20.) Ultimately, Trinity's Motion to Compel was granted. (Minute Order of May 23, 2001 [Dkt # 203].)

It appears that a claim was submitted by Richard Hesse based on injuries he allegedly incurred as a result of being struck by the Western truck driven by Hanna. Hesse's claim states, "Semi jack-knifed ahead crossing both lanes causing chain reaction–heavy fog and ice on surface

of road–another semi unable to stop reared [sic] ended us. More vehicles piled up behind." (Def.'s Post-Trial Mot., Ex. 1A.)

It is indeed anomalous that a party can fail to respond to a summons, fail to perform any of the obligations of responding to discovery or incur any of the cost of litigation and trial, and yet come out with a verdict in its favor absolving it of any responsibility. But in this case there is more than simply an anomaly. In this case, where the factual circumstances of the accident were sharply disputed, Western and Hanna's failure to participate in the lawsuit deprived Trinity of discovery that may possibly have supported Trinity's version of the facts. Equally significant, notwithstanding the lack of discovery from Western and Hanna, Chesler's counsel painted Trinity's driver as negligent by contrast to Western's driver. He stated in closing argument, "The Western Industries truck doesn't have any difficulty coming to a stop." (Tr. May 2, 2001 at 171.) The obvious implication is that Trinity's truck should not have had any difficulty, either. The information that has since come to light suggests that Chesler's argument may have been wrong.

Trinity feared that it would be prejudiced if Western and Hanna were allowed to participate in the trial in any way to minimize their liability without Trinity's having the opportunity to conduct discovery of Western and Hanna. The Court sought to eliminate that prejudice by not having Western and Hanna participate in the trial. But the same prejudice developed because of *Chesler's* decision to take up the task of minimizing Western and Hanna's liability. In his argument, Chesler's counsel told the jury, "Do not compound the injustice of their [Trinity's] defense that they didn't have to stop behind stopped traffic. Don't reward that. Don't reward their suing of Western Industries." (Tr. May 2, 2001 at 170-71.) The jury obviously bought Chesler's counsel's argument in finding Western and Hanna to have no share of the fault.

Chesler argues that Trinity had reason to know about the Hesse accident prior to April 18, 2001, and submits an affidavit from the driver of the Hesse vehicle that she had photographs delivered to Trinity's attorney on April 20, 2001. (Pl.'s Resp., Ex. 1.) However, in light of the fact that as late as May 8, 2001, after the trial was concluded, Western and Hanna's own counsel was unable to represent for the record the relationship between the Hesse claim and this case (Tr. May 8, 2001 at 19-20), it cannot fairly be said that Trinity had *evidence* prior to trial that it withheld or that Trinity failed to exercise due diligence. Rather, the last-minute arrival of Western and Hanna created a *lead* for discovery that had previously not been available.

The goal of the Federal Rules of Civil Procedure is "to secure the just, speedy, and inexpensive determination of every action." Fed. R. Civ. P. 1. Justice should not be sacrificed to achieve speed. Thus, a new trial must be ordered, with sufficient time to allow Trinity (and any other party) to obtain discovery from and relating to Western and Hanna.

As discussed above, one of the most contentious aspects of the trial was determining the effect of the default order on the allocation of damages and the appropriate instructions to the jury. In retrospect, the jury instruction that was given, that Trinity's claims against Western and Hanna were "resolved" in favor of Trinity, seems to have potential for confusing the jury. Because Trinity's request for a new trial is being granted for a number of reasons, including allowing Trinity to take discovery of Hanna and Western, the earlier concern that allowing Western and Hanna to appear and defend would delay the trial is moot. The policy disfavoring default judgments in favor of determination on the merits as well as the interest in avoiding the potential confusion and error suggest that the default order against Western and Hanna be vacated and that they be permitted to defend on the merits.

C. There must be a hearing on the last-minute settlement between third-party defendant Reid and Chesler, and if that settlement is legally effective to limit Reid's contribution liability, Trinity should be able to inform the jury about it.

After the jury was instructed and retired to deliberate, Chesler and Reid announced that they had reached a written settlement agreement. That agreement has not been produced, and nothing is known of its terms except that it is a $50,000/$5,000 high-low agreement. (Pl.'s Resp. at 8.) Trinity questions the propriety of this settlement agreement, as well as the ability of a plaintiff to settle with a third-party defendant. Obviously the propriety of the agreement cannot be determined until more is known about the terms of the agreement. Furthermore, to limit a joint tortfeasor's obligation of contribution, there must be a finding by the court after hearing that the settlement is in good faith. Illinois Joint Tortfeasor Contribution Act, 740 Ill. Comp. Stat. 100/2 (c) and (d) (2000). The hearing will include the legal issue raised by Trinity.

Even assuming, *arguendo*, that the agreement is legally effective, the timing of the announcement of the settlement agreement raises additional questions. From the beginning of the trial Reid's attorney conducted an extremely limited defense on behalf of a contribution defendant in a case where the plaintiff was seeking in excess of $20 million. Reid's counsel did nothing to minimize damages, and, in fact, told the jury in both opening statement and closing argument that Chesler was injured severely and permanently, and argued in closing that Chesler had "bad injuries," and that Trinity had "no argument on damages." (Tr. April 24, 2001 at 30; May 2, 2001 at 163-64.) Chesler now states that the settlement agreement was not reached until after the jury had concluded its first day of deliberations. (Pl.'s Resp. at 8.) However, on May 4, 2001 (the second day of jury deliberations), Reid's lawyer stated that Reid and Chesler had a *written* settlement agreement, which he did not produce. In order to achieve an executed written settlement agreement by May 4, 2001,

an agreement in principle was almost undoubtedly reached earlier. These facts suggest the possibility that the agreement had been reached much earlier, perhaps even before trial, but that the execution of the written document was postponed to avoid the necessity of producing it to Trinity.

Trinity correctly points out that evidence of a settlement agreement may be offered to prove bias or prejudice of a witness. Fed. R. Evid. 408. Furthermore, the Seventh Circuit has said that a co-defendant of a settling defendant has the right to use the settlement agreement for cross-examination where the jury is otherwise left with the impression that the settling defendant is "a real defendant." *Douglass v. Hustler Magazine, Inc.*, 769 F. 2d 1128, 1142-43 (7th Cir. 1985). Thus, if there is a settlement agreement between Reid and Chesler, Trinity has the right to present evidence of that agreement to the jury and to argue that Reid's approach to the case is based not solely on confidence in his lack of liability but also because he has made a deal and has no real risk of having to pay any damages.

## CONCLUSION

For the foregoing reasons, Trinity's motion for judgment as a matter of law is DENIED, Trinity's motion for a new trial is GRANTED and the judgment entered on May 8, 2001 is VACATED. Western and Hanna's motion to vacate order of default is GRANTED.

**IT IS SO ORDERED.**

*Geraldine Soat Brown*
**GERALDINE SOAT BROWN**
**United States Magistrate Judge**

**DATED: December 11, 2001**

20